[Cite as *State v. Taylor*, 2020-Ohio-3589.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                              :

    Plaintiff-Appellee,              :

                                                         No. 108347

    v.                                          :

SAMUEL TAYLOR,                         :

    Defendant-Appellant.           :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 2, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-629692-A

---

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kevin R. Filiatraut, Assistant Prosecuting Attorney, *for appellee.*

Walter H. Edwards, Jr., *for appellant.*

EILEEN T. GALLAGHER, A.J.:

{¶ 1} Defendant-appellant, Samuel Taylor ("Taylor"), appeals his convictions and claims the following four errors:

1. Appellant's Sixth Amendment right to the effective assistance of counsel was violated where trial counsel failed to raise objections to

improper evidence and comments and failed to request a jury instruction for a lesser included offense.

2. The state committed prosecutorial misconduct by improperly stating the law to the jury during closing arguments.

3. The trial court erred in denying appellant's motion for acquittal pursuant to Ohio Crim.R. 29.

4. Appellant's convictions were against the manifest weight of the evidence.

{¶ 2} We find no merit to the appeal and affirm the trial court's judgment.

## I. Facts and Procedural History

{¶ 3} Taylor was charged, in connection with the death of William Lodge ("William"), with one count of aggravated murder in violation of R.C. 2903.01(A), one count of murder in violation of R.C. 2903.02(B), and two counts of felonious assault in violation of R.C. 2903.11(A)(1) and 2903.11(A)(2). The felonious assault charges contained repeat violent offender and notice of prior conviction specifications, which were bifurcated and tried separately to the bench. The four counts of the indictment were tried to a jury.

{¶ 4} William bled to death after sustaining a cut on his head on the night of June 2, 2018. Anthony Lodge ("Anthony"), William's brother, testified at trial that in June 2018, William, who had early signs of dementia, was living in their sister Lydia's home in Maple Heights, Ohio. (Tr. 192.) According to Anthony, Lydia was married to Taylor for a period of time, was no longer married to him in June 2018, and was "restricted from [her] house." (Tr. 222.) Lydia was in the hospital in early

June 2018, and Anthony was taking care of William but lived in an apartment at a different location.  (Tr. 191, 235.)

{¶ 5}  On June 2, 2018, Anthony drove William to a nearby Giant Eagle store to buy beer.  Anthony waited in the car while William was shopping.  Unbeknownst to Anthony, William walked home from the store, leaving Anthony waiting in the parking lot.  (Tr. 192, 212.)  After waiting an hour, Anthony searched for William in the store and eventually found him back at Lydia's house with Taylor and a mutual friend, Gary Simmons ("Simmons").  William, Anthony, Taylor, and Simmons had been friends for more than four decades, and they were about to start drinking.  According to Anthony, they were all "drinkers."  (Tr. 194.)

{¶ 6}  Anthony scolded William for leaving him waiting in the Giant Eagle parking lot and an argument ensued.  Taylor joined the argument swinging a box cutter at Anthony.  (Tr. 196.)  Simmons grabbed Taylor by the neck and restrained him from cutting Anthony.  (Tr. 198.)  Just then, Anthony's phone happened to ring, he was called away, and the fight ended.  (Tr. 198.)  Anthony left the house sometime between 8:30 and 9:00 p.m.  Taylor, William, and Simmons continued drinking for a few more hours.

{¶ 7}  Simmons testified that as he was pouring another drink at approximately 11:00 p.m., he looked up and saw William and Taylor wrestling "nose to nose."  (Tr. 247-248, 295.)  He intervened to break them up and asked William if he was okay.  William replied: "[Y]es, I'm all right."  Simmons suggested that

William spend the night at his house, but William refused, insisting "I'm cool." (Tr. 248.) Thereafter, Simmons, who was drunk, drove home. (Tr. 249.)

{¶ 8} Anthony was awakened the next morning by his girlfriend's eight-year old son, who was hungry. Anthony decided to take him to Subway and stopped by Lydia's house to see if William wanted a sandwich. (Tr. 201.) When they arrived at the house, Anthony noticed blood in the driveway and on the front porch. Anthony described the inside of the house as follows:

> I saw blood all over the front room. I walked in the house. I seen the house was tore up. I seen blood all over the walls, on the carpet, the kitchen wall.
>
> And I happened to look and see my brother sitting at the kitchen table and he was slumped down * * *.
>
> He was moving, trying to move his foot. * * *
>
> I walked up to my brother and I seen all of this blood in his face. * * * I touched him to see * * * if he was still alive. And he started mumbling and shaking.
>
> * * *
>
> I said what happened? What happened, bro?
>
> He managed to — he stuttered real bad. But he did call Mr. Samuel's name —

(Tr. 202.) After checking to see if Taylor was somewhere in the house, Anthony called 911. (Tr. 204.)

{¶ 9} Meanwhile, Simmons woke up in his home and discovered blood on his shoes. He immediately called William and Anthony, but neither one answered his phone. (Tr. 253.) Simmons put on the same clothes he wore the night before,

intending to go to the house when Anthony called and told him what happened to William.  (Tr. 253.)  Anthony told Simmons the Maple Heights police wanted to talk to him because they obtained his license plate number from a surveillance camera on a neighboring house.  Anthony and Simmons went together to the Maple Heights police station and made statements regarding the night's events.  (Tr. 254.)  There was blood on Simmons's clothes, and he turned his clothes over to police.  (Tr. 256.)

{¶ 10}  Dr. Joseph Felo, the deputy chief medical examiner of the Cuyahoga County Medical Examiner's Office, testified that William bled to death from a cut in the temple area of his face.  (Tr. 308.)  He described the cut as a "clean cut" from a sharp object such as a knife rather than from a blow from a solid blunt object or a broken piece of glass, which would have made an irregular "laceration."  (Tr. 313, 327.)  A person with William's kind of injury would be able to walk and talk and ask for help.  (Tr.329.)  Dr. Felo explained that although this type of cut was not generally considered life threatening, William must have lost 20 percent of his blood because his organs failed due to an excessive blood loss.  (Tr. 309.)  Dr. Felo explained that he would expect a person with William's kind of injury to survive, but he or she would require medical treatment.  (Tr. 319.)  Thus, Dr. Felo explained:

> So, although this is a relatively minor injury, he died because of complications of the injury that was inflicted upon him by someone else.  And an inflicted wound caused by someone that results in a death is classified as a homicide.

(Tr. 320.)  He further explained that if a victim is injured by someone else, the victim's failure to successfully save himself does not change the cause of death

classification from homicide to suicide. (Tr. 333.) According to Dr. Felo, William's hands did not have any injuries, and there was no evidence of defensive wounds to suggest that he tried to defend himself. (Tr. 329.)

{¶ 11} A toxicology report from MetroHealth, where William was taken for treatment before he died, indicated that William had a blood alcohol content of .032 percent, which Dr. Felo described as a "very low level of alcohol." (Tr. 322.) However, William would have had a higher percentage of blood alcohol at the time of the cut, and Dr. Felo could not accurately calculate that level, but "it would be significantly higher than .03." (Tr. 323.)

{¶ 12} An arrest warrant was issued for Taylor a few days after the incident. (Tr. 439.) On June 19, 2018, Officer Christopher Faunce of the Maple Heights Police Department was dispatched to University Hospitals, where Taylor was a patient, to interview Taylor. Officer Faunce's body camera recorded the interview, which was played for the jury. During the interview, Taylor admitted that he swung a utility knife at William and acknowledged that William was bleeding. (Tr. 365-366.) Taylor claimed that William tried to grab the blade while trying to take the knife from him, and William's hand started to bleed. (Tr. 365, 368.) Taylor also originally claimed that he and Simmons took William to the hospital, but subsequently changed his testimony and said they left him at the house. (Tr. 366.) Finally, Taylor told police that he left the knife used to cut William in the house. (Tr. 366.)

{¶ 13} Carey Baucher, a DNA specialist with the Cuyahoga County Regional Forensic Science Laboratory, testified that she performed the DNA testing in this

case. She found no foreign DNA in the swabs taken from William's right and left fingernails. (Tr. 385.) The swabs of blood taken from the kitchen and the front porch contained only William's DNA. (Tr. 385, 388.) However, DNA on a can of beer in the kitchen contained DNA from William, Simmons, and Taylor. Swabs from another can of beer found in the milk chute contained Taylor's DNA. (Tr. 396.)

{¶ 14} Detective Thomas Halley of the Maple Heights Police Department testified that he was the lead investigator on the case. He took photographs and collected evidence from inside the home pursuant to a search warrant. Despite a thorough search of the house, he did not find a folding utility knife matching the description of the knife Taylor gave to police. However, on the floor of the basement, Detective Halley found a heap of bloody clothes William must have taken off before he went upstairs and sat on the chair in the kitchen, where he was found wearing only a pair of gym shorts and no shirt or shoes. (Tr. 416-417, 431.)

{¶ 15} Following the state's case, Taylor moved for acquittal of all counts in the indictment pursuant to Crim.R. 29. The trial court granted the motion as to the aggravated murder charge, but denied it as to the remaining charges. The jury found Taylor guilty of murder and both counts of felonious assault. The court stayed ruling on all the specifications and notices of prior convictions attendant to the felonious assault counts.[1] All counts merged for sentencing purposes, the state elected to

---

[1] The sentencing entry is a final, appealable order even though the court never ruled on the specifications. *See State v. Payne*, 8th Dist. Cuyahoga No. 17825, 2020-Ohio-1599, ¶ 8-9, citing *State ex rel. Rodriguez v. Barker*, 158 Ohio St.3d 39, 2019-Ohio-4155, 139 N.E.3d 885, ¶ 9 (reaffirming the proposition that the failure to resolve a specification does not affect the finality of a sentencing entry).

proceed on the murder conviction, and the court sentenced Taylor to 15 years to life. Taylor now appeals his convictions.

## II. Law and Analysis

### A. Ineffective Assistance of Counsel

{¶ 16} In the first assignment of error, Taylor argues his Sixth Amendment right to the effective assistance of counsel was violated when his trial counsel (1) failed to raise objections to improper evidence and misleading comments made by the prosecutor during closing arguments and (2) failed to request a jury instruction on a lesser included offense.

{¶ 17} To establish an ineffective assistance of counsel claim, the appellant must show that his trial counsel's performance was deficient and that the deficient performance prejudiced his defense. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 205, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Prejudice is established when the defendant demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

{¶ 18} Trial advocacy falling below an objective standard of reasonableness constitutes deficient performance. *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989). However, judicial scrutiny of counsel's performance is highly deferential, and "reviewing courts must refrain from second-guessing the strategic decisions of trial counsel." *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965

(1995).  In other words, strategic decisions do not constitute ineffective assistance of counsel even if they are ultimately unsuccessful.  *Id.*

## 1.  Failure to Object to Autopsy Photos

{¶ 19} Taylor first argues his trial lawyers were ineffective because they failed to object to 13 autopsy photographs introduced by the state at trial.  He contends he was prejudiced by the photographs because they were gruesome and their probative value was outweighed by the danger of unfair prejudice.

{¶ 20} However, the record contains five photographs of the cut on William's head.  Since William sustained no other injuries, these photographs were relevant to show the injury that resulted in William's death.  These photographs were also relevant because Taylor told police that he took William to the hospital for treatment before he died.  Photographs of William's head taken by police at the house the morning he was found show the cut before William was taken by EMS to MetroHealth for treatment.  Some of the autopsy photographs show his head after William received medical treatment at MetroHealth.  The police photographs show that the cut was not treated with any staples or sutures.  Autopsy photographs show that the cut was sutured closed with staples and stitches when William received treatment at MetroHealth.  The difference in these photographs was relevant to prove that Taylor lied about taking William to the hospital for treatment because, had William been taken to the hospital, his wound would have been sutured closed when Anthony discovered him the next morning.

{¶ 21} Three of the autopsy photographs showed what the wound looked like after the staples had been removed. One of the photographs showed the wound slightly more open than the others and allowed the jury to see the depth of the cut. These were the only photographs of the wound itself. Thus, there was not an excessive number of photographs of the wound admitted into evidence.

{¶ 22} Moreover, there were no photographs of the entirety of William's nude body and no photographs of the inside the decedent's body after dissection or organ removal were ever shown to the jury. The most gruesome photographs were never submitted to the jury. The photographs that were submitted to the jury, such as photographs of William's hands, were relevant to rebut Taylor's claim that William grabbed the blade of the knife during the scuffle. Dr. Felo testified that William's body showed no signs of injuries sustained in any act of self-defense. Therefore, there was no reason for defense counsel to object to the autopsy photographs.

## 2. Failure to Object to Prosecutor's Comments

{¶ 23} Taylor contends his trial counsel was ineffective because they failed to object to the prosecutor's statement during closing argument that Taylor's failure to help William obtain necessary medical treatment was akin to a hit- and-run car crash where the driver who leaves the scene is responsible for the death or injuries of the party left at the scene. Taylor argues this analogy improperly misled the jury because although Ohio law imposes a well-known duty on drivers to stop after any

kind of collision, Taylor was not legally required to render assistance or contact authorities on behalf of William.

{¶ 24} Challenged comments from closing arguments should not be reviewed in isolation; they must be considered in the context of the entire closing argument. *State v. Webster*, 8th Dist. Cuyahoga No. 102833, 2016-Ohio-2624, ¶ 99. *See also State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 107 ("[I]solated comments by a prosecutor are not to be taken out of context and given their most damaging meaning.").

{¶ 25} The prosecutor made the hit-and-run analogy during rebuttal in response to the following remarks made during Taylor's closing argument:

> All right. Now, they want to paint a picture for you that Sam is violent, but they want to convince you that because William is suffering some form of dementia, he's okay.
>
> He's forgetful. And that's the only reason that he didn't seek help once he had the cut on his forehead.
>
> A cut that was not deep. It was not serious, and he would not have died from it if he had gotten treatment for it.
>
> It's that, period. So, do you really hold Samuel Taylor responsible for a person that bleeds out over 11, 12 hours from a cut that was not a deep cut, not a serious cut, not a cut that cut any major veins or anything of that nature? And we know he's bleeding that way or that because of all the liquor he has drank.
>
> * * *
>
> Obviously, if you believe that he's responsible for the cut on William's head, that is felonious assault.
>
> That is not murder. That is felonious assault. Causing physical harm to another. That's what felonious assault is in this instance, or you say

felonious assault where he caused serious physical harm because he had the box cutter and he cut him on the forehead.

You know, but that is not murder. And I believe Dr. Felo when he testified and I think his testimony is crucial here. Because he said to you that homicide does not equal murder. Homicide do not equal murder.

* * *

In order to find him guilty, you have to believe it was foreseeable that whatever they were arguing about, and whatever cut that William sustained, somehow Sam Taylor would have known or had to know it would result in his death.

(Tr. 515-516, 518, 520.) Although Taylor admitted that he cut William with the knife, his trial counsel tried to shift the blame for the cause of the death to William. In response to this argument, the prosecutor asserted, in relevant part:

What [Taylor's attorney] just said to you, his client is not responsible for William Lodge's death. He just said that to you. And he said it's because it's not foreseeable that William Lodge would not try to help himself and get himself medical attention.

That's the argument here. Let me just say this: The law does not require a victim who's been a victim of a crime to save him or herself.

* * *

They want to put the blame on William. They're putting the blame on William. They're saying its William's job. William's dead because William didn't help himself.

* * *

I asked Dr. Felo, I gave him that scenario. If someone gets cut, and they know they're bleeding and they don't call 9-1-1, they don't get themselves help, is that somehow a suicide? His answer is no, of course not.

We lay blame where it should be laid [sic]. And it's with him. Nobody else. Think of it this way.

Think of it in another scenario. Hit and run. Driver's driving, nails a car on the side of the road, knowing that someone's in there, someone may be hurt and drives off.

And that person in that car has a phone, but doesn't call 9-1-1. That person dies. Who are we going to blame? Who are we going to be blaming for that? Who's the law holding accountable for that? They're holding accountable the driver who hit them. Not the person who didn't save themselves.

(Tr. 521-522, 527-528.) In this context, the state's argument is not misleading. The hit-and-run analogy illustrates the state's argument that when someone causes injury to another, he or she must mitigate the harm caused to the victim or be held responsible for the consequences that result from the failure to render aid. The prosecutor made this point to rebut Taylor's suggestion that William was responsible for his own death because he failed to help himself. The state's argument was also consistent with Dr. Felo's testimony that a victim's failure to save himself from an injury caused by someone else does not change the death classification from a homicide to a suicide; it is still a homicide. (Tr. 333.)

{¶ 26} Moreover, the state's argument was consistent with the law applicable to the murder charge alleged in the indictment. Taylor was charged with felony murder in violation of R.C. 2903.02(B), which required the state to prove that Taylor caused William's death "as a proximate result of the offender's committing * * * an offense of violence that is a felony of the first or second degree * * *." In addition to the murder charge, Taylor was charged with two counts of felonious assault, in

violation of R.C. 2903.11(A)(1) and 2903.11(A)(2), for knowingly causing, or attempting to cause William serious physical harm by means of a deadly weapon. Both counts of felonious assault were second-degree felonies. Thus, if the jury found that Taylor committed felonious assault by knowingly causing or attempting to cause serious physical harm to William by means of a deadly weapon, it would also have to hold him responsible for William's death if his death was the proximate result of either or both of the felonious assaults. Just as a driver is responsible for any harm resulting from a hit-and-run car crash, Taylor was responsible, pursuant to R.C. 2903.02(B), for any harm resulting from his acts of felonious assault. Therefore, even if defense counsel had objected to the state's hit-and-run analogy, the objection would have been appropriately overruled.

### 3. Lesser Included Offense Charge

{¶ 27} Taylor further argues his trial counsel was ineffective because they failed to request a jury instruction on the lesser included offense of reckless homicide. However, Taylor was convicted of felony murder in violation of R.C. 2903.02(B), which states, in relevant part, that "[n]o person shall cause the death of another as a proximate result of the offender's committing * * * an offense of violence that is a felony of the first or second degree * * *." In order to prove felony murder under R.C. 2903.02(B), the state must prove that the victim's death was proximately caused by the commission or attempted commission of a violent predicate offense, such as felonious assault. This court has held that felony murder under R.C. 2903.02(B) is a strict-liability offense because it does not include a

culpable mental state for causing another's death. *State v. Owens*, 8th Dist. Cuyahoga No. 107494, 2019-Ohio-2221, ¶ 21, citing *State v. Nolan*, 141 Ohio St.3d 454, 2014-Ohio-4800, 25 N.E.3d 1016, ¶ 9. *See also State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 43 (felony murder under R.C. 2903.02(B) contains no mens rea component).

{¶ 28} In *Owens*, this court held that although "it is conceivable that a reckless homicide could factually be found within the commission of felony murder," it is not a lesser included offense felony murder as defined by the relevant statutes because the reckless homicide statute imposes a greater mental state with respect to causing the death of the victim than does the felony murder statute. *Id.* at ¶ 26. To be convicted of reckless homicide, R.C. 2903.041 requires the state to prove that the defendant recklessly caused the victim's death. There must be evidence that the defendant demonstrated "'a heedless indifference to the consequences' and a 'disregard' of a known risk in causing the death of the victim." *Id.* at ¶ 24. By contrast, an offender may commit felony murder without having committed reckless homicide because, under the felony murder statute, the defendant may commit felony murder without any culpable mental state with respect to causing the victim's death. *Id.*

{¶ 29} Taylor was convicted of two counts of felonious assault in violation of R.C. 2903.11(A)(1) and 2903.11(A)(2), for knowingly causing, or attempting to cause William serious physical harm by means of a deadly weapon. Because William died as a result of injuries he sustained from the act of felonious assault, Taylor is guilty

of felony murder under R.C. 2903.02(B), regardless of his purpose. Therefore, even if counsel had requested a jury instruction on reckless homicide, it would have been denied as inappropriate under the circumstances of this case.

{¶ 30} The first assignment of error is overruled.

## B. Prosecutorial Misconduct

{¶ 31} In the second assignment of error, Taylor argues the state committed prosecutorial misconduct by inaccurately stating law to the jury during closing argument. He contends the state improperly imposed a duty on Taylor to assist William after he was cut where there was no such duty of care. Again, Taylor objects to the prosecutor's hit-and-run analogy.

{¶ 32} The test for prosecutorial misconduct in closing argument is "'whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.'" *State v. Hessler*, 90 Ohio St.3d 108, 125, 734 N.E.2d 1237 (2000). The touchstone analysis is the fairness of the trial, not the culpability of the prosecutor. *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶ 33} As explained in the previous assignment of error, the hit-and-run analogy illustrated the point that when someone causes injury to another, he or she must mitigate the harm caused to the victim or be held responsible for the consequences resulting from the harm and subsequent failure to render aid. The argument was consistent with the felony murder statute, which holds an offender criminally liable for a victim's death if the death resulted from the offender's

"committing * * * an offense of violence that is a felony of the first or second degree * * *." R.C. 2903.02(B). Although there is no express duty to render a victim assistance under the statute, the failure to render life-saving aid will result in a felony murder conviction if the victim's death was proximately caused by the defendant's violent criminal acts. We, therefore, cannot say that the prosecutor's hit-and-run analogy was improper under the circumstances of this case nor can we say that Taylor was prejudiced by it.

{¶ 34} The second assignment of error is overruled.

### C. Sufficiency and Manifest Weight of the Evidence

{¶ 35} In the third assignment of error, Taylor argues the trial court erred in denying his Crim.R. 29 motion for acquittal because his convictions are not supported by sufficient evidence. In the fourth assignment of error, Taylor argues his convictions are against the manifest weight of the evidence. Although the terms "sufficiency" and "weight" of the evidence are "quantitatively and qualitatively different," we address these issues together because they are closely related, while applying the distinct standards of review. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 36} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a

reasonable doubt.  *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 37} In contrast to sufficiency, "weight of the evidence involves the inclination of the greater amount of credible evidence."  *Thompkins* at 387.  While "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief."  *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386-387.  "In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?"  *Id.*  The reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses to determine "'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"  *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983).

{¶ 38} In conducting such a review, the Ohio Supreme Court has stated that the appellate court "sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of conflicting testimony."  *Id.* at 546-547, quoting *Tibbs v. Florida*, 457 U.S. 31, 45, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).  The Supreme Court's characterization of the appellate court as a "thirteenth juror" refers to the appellate court's "'discretionary power to grant a new trial.'"  *Id.* at 547, quoting *Martin* at 175. As a "thirteenth juror," the appellate court may disagree with the factfinder's

resolution of the conflicting evidence and, in effect, create a deadlocked jury, which requires a new trial.

{¶ 39} However, our status as a "thirteenth juror" is not equal to the other twelve jurors, who are uniquely positioned to view the witnesses' demeanor, gestures, facial expressions, and voice inflections. These outward behaviors are not evident in a written transcript. Demeanor is not what the witness says, but the manner in which he or she says it. Demeanor evidence is invaluable in assessing a witness's credibility, yet it is totally lost in transmission to the court of appeals. It is for this reason that "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶ 40} "Because the trier of fact sees and hears the witnesses and is particularly competent to decide 'whether, and to what extent, to credit the testimony of particular witnesses,' we must afford substantial deference to its determinations of credibility." *Barberton v. Jenney*, 126 Ohio St.3d 5, 2010-Ohio-2420, 929 N.E.2d 1047, ¶ 20, quoting *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 Ohio App. LEXIS 3709, 4 (Aug. 22, 1997). Although we have the discretionary power of a "thirteenth juror" to grant a new trial, that power "'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 547, quoting *Martin* at 175. A finding that a conviction was supported by the manifest weight of the evidence necessarily

includes a finding of sufficiency. *State v. Robinson*, 8th Dist. Cuyahoga No. 96463, 2011-Ohio-6077.

**{¶ 41}** Taylor was convicted of two counts of felonious assault in violation of R.C. 2903.11(A)(1) and 2903.11(A)(2), which state, in relevant part, that "no person shall knowingly * * * cause serious physical harm to another" or "cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." Taylor argues the state failed to prove that he acted "knowingly" when he cut William's head with the knife. R.C. 2901.22(B) defines the term "knowingly" as follows:

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

**{¶ 42}** Simmons testified that he was drinking with Taylor, Williams, and Anthony for hours before the incident occurred. When Anthony arrived and argued with William about leaving him waiting at the Giant Eagle, Simmons observed Taylor, who was holding a box cutter knife, insert himself into the argument even though it had nothing to do with him. Shortly thereafter, Simmons saw Taylor approach Anthony "like they were going to fight or something." (Tr. 241.) Simmons grabbed Taylor by the neck and restrained him from cutting Anthony. (Tr. 198.) A few hours later, Simmons observed Taylor fighting with William. Simmons

described them as "close, like, they were fighting or wrestling." (Tr. 247-248.) Simmons again intervened and broke up the fight without realizing that William's head had been cut. (Tr. 249.) William must have sustained the cut during this fight with Taylor because Simmons later discovered blood on his clothes and shoes, and Dr. Felo testified that William sustained only one injury. Dr. Felo also testified that the cut was made by a sharp knife because it was a "clean cut" as opposed to a jagged "laceration" caused by a blunt object or a broken piece of glass. (Tr. 313, 327.)

{¶ 43} The clean cut on William's head could not have been made by accident; it required Taylor to raise the knife above his head and slice William's head. Also, the cut is deeper than a scratch and extends several inches long. Moreover, Taylor admitted in his statement to police that he cut William, but claimed William cut his hand rather than his head. Nevertheless, he also admitted that he could not stop William from bleeding. Therefore, there was sufficient evidence that Taylor knowingly cut William's head and knew he was bleeding.

{¶ 44} Although Taylor claims his convictions are not supported by credible evidence, he fails to explain how his convictions are against the manifest weight of the evidence. We find no reason to doubt Simmons's testimony. Although Taylor claimed that William grabbed the knife and cut his hands, Dr. Felo testified that William had no injuries to his hands, and the autopsy photographs of William's hands corroborate Dr. Felo's testimony. Indeed, Taylor's initial statement that he took William to the hospital because he could not stop the bleeding is belied by the evidence that William's head wound was not treated with sutures until the day after

the incident. Thus, Taylor's incredulous statements only serve to further incriminate him, and his felonious assault convictions are not against the manifest weight of the evidence.

{¶ 45} As previously stated, Taylor was convicted of felony murder under R.C. 2903.02(B), which required the state to prove that William's death was the proximate result of Taylor acts of felonious assault. Taylor argues there is no evidence that he proximately caused William's death by cutting his head since the injury was non-life threatening and many hours elapsed between the time Williams sustained the cut and the time he died.

{¶ 46} This court has held that for criminal conduct to constitute the "proximate cause" of a result, the conduct must have (1) caused the result, in that but for the conduct the result would not have occurred, and (2) the result must have been foreseeable. *State v. Muntaser*, 8th Dist. Cuyahoga No. 81915, 2003-Ohio-5809, ¶ 38, citing *State v. Lovelace*, 137 Ohio App.3d 206, 738 N.E.2d 418 (1st Dist.1999). Foreseeability is determined from the perspective of what the defendant knew or should have known, when viewed in light of ordinary experience. *Id.* It is not necessary that the defendant be able to foresee the precise consequences of his conduct; only that the consequences be foreseeable in the sense that what actually transpired was natural and logical in that it was within the scope of the risk created by the defendant. *Id.*

{¶ 47} The evidence showed that William had been drinking and that he suffered from a mental disability that was obvious to anyone who knew him,

including Taylor. (Tr. 191.) There was also evidence that the cut on William's head caused him to lose copious amounts of blood as described by Anthony and as depicted in photographs of the house and of William's blood-drenched clothes. Common sense dictates that the loss of excessive blood could be life-threatening, and Dr. Felo testified that William died as the result of losing excessive amounts of blood. In other words, it was foreseeable that the cut would result in William's death if he did not receive prompt medical treatment to close the wound. Therefore, there was sufficient, competent, and credible evidence that William died as a proximate result of Taylor's acts of felonious assault.

{¶ 48} The third and fourth assignments of error are overruled.

{¶ 49} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, ADMINISTRATIVE JUDGE

ANITA LASTER MAYS, J., and
EILEEN A. GALLAGHER, J., CONCUR