[Cite as *State v. Thomas*, 2023-Ohio-302.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 111425 |
| v. | : | |
| DEANGELO E. THOMAS, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** February 2, 2023

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-651272-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Carl J. Mazzone and Morgan Austin, Assistant Prosecuting Attorneys, *for appellee.*

Joseph V. Pagano, *for appellant.*

EILEEN T. GALLAGHER, J.:

{¶ 1} Defendant-appellant, Deangelo Thomas ("Thomas"), appeals his convictions and sentence. He claims the following errors:

1. The trial court erred by admitting the testimony of Dwayne McCully which was disclosed for the first time during trial and deprived

appellant of his constitutional rights to due process and a fair trial and violated Crim.R. 16.

2. The court erred by admitting evidence and testimony that was not timely disclosed or was not properly authenticated or was irrelevant, redundant, and admitted in violation of Evid.R. 401, 402, and 403, which deprived appellant of his federal and constitutional rights to due process, effective representation, and a fair trial.

3. The trial court erred when it denied appellant's motions for acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions.

4. Appellant's convictions are against the manifest weight of the evidence.

5. Appellant's sentence on Count 3 is invalid because it was imposed pursuant to the Regan Tokes Act Amendments, S.B. 201, which violates the United States and Ohio Constitutions.

6. Appellant received ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitutions and Section 10, Article I of the Ohio Constitution for not raising a constitutional challenge to the application of the Reagan Tokes Law.

{¶ 2} We affirm the trial court's judgment.

## I. Facts and Procedural History

{¶ 3} Thomas was charged with two counts of aggravated murder, one count of aggravated burglary, two counts of felonious assault, one count of attempted murder, and one count of having weapons while under disability in connection with the shooting death of Arianne Welch ("Welch") on June 7, 2020. All the charges, except for the having weapons while under disability charge, included notice of prior conviction and repeat-violent-offender specifications, as well as one- and three-year firearm specifications.

{¶ 4} The case proceeded to a jury trial in February 2022. Prior to trial, Thomas moved to bifurcate the notice of prior conviction and repeat-violent-offender specifications and the weapons while under disability charge from the jury trial. He also filed a notice of alibi, indicating that he was at a home on Capital Avenue in Cleveland, Ohio on the morning of June 7, 2020.

{¶ 5} Officer William Dwulat ("Dwulat"), of the Cleveland Police Department, testified that he responded to a 9-1-1 call, reporting that a woman had been shot on Mount Auburn Avenue on the morning of June 7, 2020. When he arrived on the scene, he was met by the 9-1-1 caller, who identified himself as Robert Moss, Sr. ("Moss"). Moss directed Dwulat's attention to a woman who was hiding behind Moss's truck in his driveway. The woman, Maisha Kinlow ("Kinlow"), informed Dwulat that her friend had been shot in the upstairs apartment of the two-family house across the street. (Tr. 353.) Dwulat testified that Kinlow appeared "extremely frightened and scared" and that she was afraid the perpetrator was going to kill her too. (Tr. 353.)

{¶ 6} Kinlow identified Thomas as the shooter to police at the scene. (Tr. 378.) She also told police that Thomas was driving a blue Dodge Durango. (Tr. 378, State's exhibit No. 6A.) The description of Thomas's vehicle was striking to Dwulat because he had observed a blue Dodge Durango driving down Mount Auburn Avenue when he arrived on the scene. He noted the Durango because he, himself, used to own a Durango. (Tr. 386.) Kinlow told police that Thomas was a

bald, African-American man with a beard. The man Dwulat observed driving the Durango matched the description provided by Kinlow. (Tr. 381.)

{¶ 7} Moss testified that he was sitting on his front porch on the morning of June 7, 2020, when he heard several gunshots. (Tr. 465.) He then heard a voice across the street calling, "Help me, help me." (Tr. 465-466.) Moss looked over and saw a woman, later identified as Kinlow, climbing over the railing of the second-story balcony. (Tr. 466-467.) Moss called 9-1-1 at 11:38 a.m. and continued to watch Kinlow. (Tr. 1327.) He explained that a mattress happened to be laying in the yard next door. A man walking down the street heard Kinlow's calls for help and pushed the mattress beneath the balcony where Kinlow was standing. (Tr. 471.) Kinlow jumped onto the mattress and ran across the street to Moss's backyard. (Tr. 471.)

{¶ 8} Kinlow testified that she knew Thomas well because he used to date her mother and later dated her friend Welch. (Tr. 544-545, 548.) Kinlow and her sister moved into Thomas's home in 2017, after their mother passed away, and she considered Thomas her "step dad." (Tr. 547-548, 554.) Kinlow lived with Thomas "for about eight months to a year." (Tr. 548.)

{¶ 9} Welch dated Thomas from 2018 until shortly before her death in June 2020. They were no longer dating at the time Welch was murdered and, according to Kinlow, Welch was "scared" of Thomas after their breakup. (Tr. 569-570.) Kinlow testified that although Thomas lived with Welch in the apartment on Mount Auburn Avenue, he moved out of the apartment two weeks before the shooting, and Welch changed the locks on the door after she and Thomas broke up. (Tr. 591.)

{¶ 10} Kinlow slept in Welch's apartment the night before the shooting. On the morning of June 7, 2020, Welch and Kinlow woke up, smoked marijuana, and dressed to go shopping. Just as they were about to leave the apartment, Kinlow went into a bedroom to retrieve the charging cord for her phone. While Kinlow was in the bedroom, Welch opened the door and screamed, "Oh, my God, he's here." (Tr. 596.) Kinlow turned toward the door and observed Welch trying to push the door closed, but a man's foot was wedged in the doorway preventing its closure. (Tr. 596.) Kinlow helped to push the door closed, but they were unsuccessful, and Welch told Kinlow: "Run, friend, run." (Tr. 597.)

{¶ 11} Kinlow turned and ran into a bedroom in the front of the apartment. As she was running, she heard several gunshots behind her. After a period of quiet, Kinlow thought Thomas had gone so she peaked around a dresser and saw Thomas standing next to Welch's body on the floor. She heard Thomas ask Welch, "Where did your friend go? Maisha, Mocha, where she at? That bitch left you here to die. She left you." (Tr. 598.)

{¶ 12} Thereafter, Kinlow climbed out of the bedroom window onto the balcony from which she made her escape. When asked how certain she was that Thomas was the person who shot Welch, she replied, "100 percent sure." (Tr. 601-602.) On cross-examination, Kinlow further stated: "I knew it was Deangelo [Thomas]. It's not like he was somebody I didn't know what he looked like or I didn't know his appearance; I knew him when I see him." (Tr. 808.) According to Kinlow,

Thomas drove away after the shooting, but returned and was present at the scene when the ambulances arrived. (Tr. 603.)

{¶ 13} Dwayne McCully ("McCully") occupied the downstairs unit of the two-family house where the shooting occurred. McCully testified that he observed Welch and Thomas interact during the four months they lived in the upstairs apartment, and he described their relationship as "toxic." (Tr. 901.)

{¶ 14} McCully testified that on the night of June 6, 2020, he returned home from a family party at approximately 11:30 p.m. and went into the backyard to let his dog out. While he was watching his dog, Thomas came out of the bushes and, referring to Welch, asked McCully: "Have you seen that bitch?" (Tr. 913.) Thomas also told McCully: "She has something incriminating on me and I'm gon' to kill the bitch." (Tr. 915.) McCully replied: "You need to reconsider, * * * because * * * your destiny is going to be jail or the grave." (Tr. 915.) McCully did not think Thomas really intended to kill Welch and went inside for the night.

{¶ 15} Dr. Dan Galita, a forensic pathologist and medical examiner at the Cuyahoga County Medical Examiner's Office, performed an autopsy on Welch's body. He testified at trial that Welch sustained nine gunshot wounds, at least two of which were fatal. (Tr. 1072.)

{¶ 16} Detective Gregory Cook ("Cook"), a detective in the Cleveland Police Department's homicide unit, testified that he and Detective Andrew Hayduk ("Hayduk") were investigating an unrelated murder on the morning of June 7, 2020. They were on their way to meet with a witness on Capital Avenue in Cleveland when

they observed several police cars on Mount Auburn Avenue. A patrol officer informed them that a shooting had occurred. The shooting on Mount Auburn Avenue was not officially a homicide case yet so the detectives continued on to Capital Avenue to meet their witness, Allen Wilson ("Wilson").

{¶ 17} Upon arriving at the residence on Capital Avenue, Cook knocked on the door, and an African-American man answered. Cook advised the man that he was there to speak to Wilson. After a brief exchange between Wilson and the detectives, the detectives left the house and returned to the homicide unit before being called to investigate Welch's death on Mount Auburn Avenue later that afternoon.

{¶ 18} Nearly nine months later, Cook received two recorded phone calls from Thomas, who was calling from the Cuyahoga County jail. In the phone calls, which were played for the jury, Thomas claimed he was the individual who opened the door for the detectives on Capital Avenue on June 7, 2020. He asserted that because he was on Capital Avenue, he could not have committed the homicide on Mount Auburn. On further investigation, Cook determined that Welch was murdered over an hour before he arrived at the house on Capital Avenue and that Thomas could have committed the murder before going to the house on Capital Avenue since Capital Avenue was approximately one mile from Mount Auburn. (Tr. 1259, 1266-1277, exhibit No. 12.)

{¶ 19} Hayduk, a homicide detective with the Cleveland Police Department, testified that he was assigned to investigate Welch's murder. He interviewed Kinlow

at the hospital on the day of the murder, and Kinlow identified Thomas as the shooter who killed Welch. Hayduk interviewed Thomas after his arrest approximately two weeks later, and Thomas never mentioned his alibi defense that he was on Capital Avenue at the time of the shooting during the interview. (Tr. 1345.)

{¶ 20} Thomas presented two alibi witnesses; Bernard Evans ("Evans") and Allen Wilson ("Wilson"). Thomas offered the testimony of these witnesses to show that he was on Capital Avenue at the time Welch was murdered and, therefore, could not have killed her. As previously stated, Moss called 9-1-1 at 11:38 a.m., which indicated the shooting occurred at about that time. (Tr. 1327.) When asked what time the detectives arrived at Wilson's home on Capital Avenue, Evans stated:

> It was daylight. I would say 9:00ish, 12:00ish, 11:00ish. You know, afternoon— morning, afternoon. I can't recall. I can't actually say what time. It was daylight.

(Tr. 1407.) Wilson testified that the detectives arrived at his home on Capital Avenue between 7:00 and 8:00 a.m. on the morning of June 7, 2020. (Tr. 1433.) On cross-examination, the prosecutor, seeking clarification, asked Wilson if the detectives arrived to speak with him at 7:00 a.m., and Wilson replied: "I don't know what time it was, but they wanted to talk to me. I never looked at the clock." (Tr. 1446.)

{¶ 21} After hearing all the evidence, the jury found Thomas guilty of two counts of aggravated murder, two counts of felonious assault, and one count of aggravated burglary alleged in Counts 1, 2, 3, 4, and 6 of the indictment. The jury acquitted Thomas of the attempted murder charge alleged in Count 5. The court

found him guilty of one count of having weapons while under disability and the repeat-violent-offender and notice-of-prior-conviction specifications attendant to Counts 1, 2, 3, 4 and 6.

{¶ 22} The court merged the two aggravated-murder convictions alleged in Counts 1 and 2 with the felonious-assault conviction alleged in Count 4 as well as the one- and three-year firearm specifications. The court ordered two firearm specifications to be served consecutively pursuant to R.C. 2929.14(B)(1)(g) and ordered Thomas to serve the three-year firearm specifications on Counts 1 and 6. The court sentenced Thomas to life with parole eligibility after 30 years on Count 1 (aggravated murder), 11 to 16 and one-half years on Count 3 (aggravated burglary); eight years on Count 6 (felonious assault), and 36 months on Count 7 (having weapons while under disability). The court ordered the sentences on Counts 1, 3, 6, and 7 to be served concurrently. Finally, the court imposed five years of mandatory postrelease control, waived fines and costs, and awarded Thomas 630 days of jail-time credit.

{¶ 23} Thomas now appeals his convictions and sentence, raising six assignments of error, which we discuss out of order, beginning with the third and fourth assignments of error.

## II. Law and Analysis

### A. Sufficiency and Manifest Weight of the Evidence

{¶ 24} In the third and fourth assignments of error, Thomas argues his convictions are not supported by sufficient evidence and are against the manifest

weight of the evidence. Although the terms "sufficiency" and "weight" of the evidence are "quantitatively and qualitatively different," we address these issues together because they are closely related, while applying the distinct standards of review. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 25} The test for sufficiency requires a determination as to whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 26} In contrast to sufficiency, "weight of the evidence involves the inclination of the greater amount of credible evidence." *Thompkins* at 387. While "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386-387. "In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *Id.*

{¶ 27} In a manifest weight challenge, the reviewing court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way

and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* 78 Ohio St.3d 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "A conviction should be reversed as against the manifest weight of the evidence only in the most 'exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Burks*, 8th Dist. Cuyahoga No. 106639, 2018-Ohio-4777, ¶ 47, quoting *Thompkins* at 387.

{¶ 28} A finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. *State v. Taylor*, 8th Dist. Cuyahoga No. 108347, 2020-Ohio-3589, ¶ 40, citing *State v. Robinson*, 8th Dist. Cuyahoga No. 96463, 2011-Ohio-6077.

{¶ 29} In both the third and fourth assignments of error, Thomas contends there is no credible evidence that he was the perpetrator of the crimes that resulted in Welch's death or that he possessed a firearm. Thomas was convicted of two counts of aggravated murder, in violation of R.C. 2903.01(A) and 2903.01(B). R.C. 2903.01(A)(1) states, in relevant part, that "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * * ." R.C. 2903.01(B) provides, in relevant part:

> No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present[.]

**{¶ 30}** Thomas was convicted of aggravated burglary in violation of R.C. 2911.11(A)(1), which states, in relevant part:

> No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if * * * [t]he offender inflicts, or attempts or threatens to inflict physical harm on another[.]

**{¶ 31}** Thomas was also convicted of two counts of felonious assault in violation of R.C. 2903.11(A)(1) and 2903.11(A)(2). R.C. 2903.11(A)(1) provides that "[no]person shall knowingly * * * [c]ause serious physical harm to another or to another's unborn[.]" R.C. 2903.11(A)(2) provides that "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."

**{¶ 32}** Kinlow testified at trial that she saw Thomas force his way into Welch's apartment where he fired several gunshots at Welch. She also testified that Welch was afraid of Thomas after their breakup and that she observed an ambulance transport Welch to the hospital, where she was pronounced dead, immediately after the shooting. Dr. Galita testified that Welch died as result of at least two fatal gunshot wounds. And, McCully testified that Thomas came out of the bushes at approximately 11:30 p.m. the night before the shooting and stated that he was looking for Welch because he was going to kill her. Moreover, Kinlow identified Thomas at the scene as the perpetrator who shot and killed Welch. Kinlow's statements were captured on police body cameras and played for the jury. It is

obvious from the videos that Kinlow was still under the stress of the event when she reported it to police. Therefore, there was competent, credible evidence that Thomas committed aggravated murder because the evidence showed that he purposely caused Welch's death with prior calculation and design.

{¶ 33} Kinlow testified that Thomas moved out of the apartment a couple of weeks before the shooting and that Welch changed the locks on the door. Welch's landlord, Phillip Perdue, also testified that Welch had asked about the changing the locks a week or two before the shooting, and McCully testified that Thomas was angry that Welch had changed the locks. As previously stated, Kinlow testified that Thomas forced his way into Welch's apartment while she and Welch were present. Therefore, there was credible evidence that Thomas committed aggravated burglary because he forcibly entered the apartment and caused Welch's death while he was trespassing in her apartment. This evidence supports the second aggravated murder conviction in violation of R.C. 2903.01(B), which requires proof that the defendant purposely caused the death of another while committing aggravated burglary.

{¶ 34} The same evidence supports Thomas's felonious-assault convictions because the evidence showed that Thomas knowingly caused serious harm to Welch by shooting her nine times and knowingly caused serious harm to Welch by means of a deadly weapon, i.e., a firearm. Therefore, there was credible evidence supporting both felonious-assault convictions.

{¶ 35} Finally, Thomas was convicted of having weapons while under disability in violation of R.C. 2923.13(A)(2), which states, in relevant part:

Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person is under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence.

{¶ 36} Kinlow testified that Thomas killed Welch with a firearm. The state presented a certified copy of a judgment entry indicating that Thomas was previously convicted of a felony offense of domestic violence. R.C. 2901.01(A)(9)(a) defines "offense of violence" as, among other things, a violation of R.C. 2919.25, the domestic-violence statute. Thus, there was competent, credible evidence that Thomas possessed a firearm while under disability.

{¶ 37} In short, there was sufficient evidence to support each of Thomas's convictions beyond a reasonable doubt, and the convictions were not against the manifest weight of the evidence. Therefore, the third and fourth assignments of error are overruled.

## B. McCully's Testimony

{¶ 38} In the first assignment of error, Thomas argues the trial court erred in allowing Dwayne McCully to testify that he met Thomas the night before the shooting and that Thomas told him he planned to kill Welch. He contends that because the state did not disclose this information prior to trial, the evidence should have been excluded pursuant to Crim.R. 16 as a discovery sanction.

{¶ 39} Crim.R. 16 requires the prosecution and defense to disclose evidence to each other in pretrial discovery, and the rule authorizes a court to impose

sanctions on a party for violations of the rule. When a discovery violation occurs, the trial court may, within its discretion, make any order that the court deems just under the circumstances. *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 33. Crim.R. 16(L)(1). *See also State v. Rucker*, 2018-Ohio-1832, 113 N.E.3d 81, ¶ 21 (8th Dist.) ("We review a trial court's sanction for a discovery violation for an abuse of discretion.").

{¶ 40} An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. In other words, "[a] court abuses its discretion when a legal rule entrusts a decision to a judge's discretion and the judge's exercise of that discretion is outside of the legally permissible range of choices." *State v. Hackett*, 164 Ohio St.3d 74, 2020-Ohio-6699, 172 N.E.3d 75, ¶ 19.

{¶ 41} This court has held that an abuse of discretion may be found where a trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, 892 N.E.2d 454, ¶ 15 (8th Dist.). When applying the abuse-of-discretion standard, a reviewing court may not substitute its judgment for that of the trial court. *Vannucci v. Schneider*, 2018-Ohio-1294, 110 N.E.3d 716, ¶ 22 (8th Dist.).

{¶ 42} "[P]rosecutorial violations of Crim.R. 16 result in reversible error only when there is a showing that (1) the prosecution's failure to disclose was willful, (2)

disclosure of the information prior to trial would have aided the accused's defense, and (3) the accused suffered prejudice." *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 131. *See also State v. Lindsey*, 8th Dist. Cuyahoga No. 106111, 2019-Ohio-782, ¶ 48.

{¶ 43} The term "willful" for purposes of Crim.R. 16 has been defined as "'intent, purpose, or design to injure.'" *State v. Litton*, 12th Dist. Preble No. CA2016-04-005, 2016-Ohio-7913, ¶ 11, quoting *State v. Bowshier*, 2d Dist. Clark No. 06-CA-41, 2007-Ohio-5364, ¶ 31; *see also State v. White*, 8th Dist. Cuyahoga No. 110452, 2022-Ohio-2130, ¶ 51.

{¶ 44} In *Jackson*, the Ohio Supreme Court held that the state's conduct in failing to disclose exculpatory evidence was not willful because the prosecutor thought the evidence was irrelevant and therefore disclosure to the defense was unnecessary. *Id.* at ¶ 128-131. In *State v. Parson*, 6 Ohio St.3d 442, 453 N.E.2d 689 (1983), the Ohio Supreme Court held that the state's failure to disclose a codefendant's statement to the defense constituted a negligent omission rather than a willful discovery violation and, therefore, did not warrant exclusion. *Id.* at syllabus.

{¶ 45} The state learned of Thomas's statements to McCully regarding his plan to kill Welch during the trial. (Tr. 741-743.) Upon learning of the statements, the state immediately informed defense counsel, and the state ensured that McCully was available to be interviewed by defense counsel before he testified. (Tr. 741-744.) The court held a hearing to determine when McCully disclosed the incriminating

evidence to the state, and McCully indicated that he first disclosed the evidence to the prosecutors during the trial. (Tr. 953-954.) Therefore, because the state had no knowledge of this evidence prior to trial, it could not have willfully withheld the evidence from the defense. In the absence of willful misconduct, the failure to disclose the evidence did not, by itself, warrant exclusion.

{¶ 46} Certainly, the evidence was prejudicial to the defense. However, it is doubtful that a timely disclosure of the evidence would have done much to aid the defense since other witnesses and evidence established Thomas's guilt. Even if McCully's statements were entered in error, the error was harmless in light of the other evidence of Thomas's guilt.

{¶ 47} Crim.R. 52(A) defines "harmless error" as "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Under the harmless-error standard of review, "the government bears the burden of demonstrating that the error did not affect the substantial rights of the defendant." *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 15, citing *United States v. Olano*, 507 U.S. 725, 741, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

{¶ 48} To be viewed as "affecting substantial rights," the error must have been prejudicial, meaning "'[i]t must have affected the outcome of the [trial] court proceedings.'" *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 7, quoting *Olano*. In other words, Crim.R. 52(A) asks whether the rights affected are "substantial" and, if so, whether a defendant has suffered any prejudice as a

result. *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 24-25.

{¶ 49} Kinlow testified that she saw Thomas forcibly enter Welch's apartment and fire numerous gunshots at her. Immediately after the shooting, while she was still under the stress of the event, she told police that Thomas shot and killed Welch. She also told police that although Thomas fled the scene following the shooting, he returned in his blue Dodge Durango while the ambulances were present. Dwulat testified that he observed the blue Durango on the scene, which corroborated Kinlow's testimony. And, Welch's landlord testified that Welch inquired about changing the locks to the apartment a week or two before the shooting, and Kinlow testified that Welch was frightened when Thomas appeared at her apartment. Thus, there was competent, credible evidence on which the jury would have convicted Thomas of aggravated murder, aggravated burglary, and felonious assault, even if McCully had never testified about the incriminating statements Thomas made to him the night before the murder.

{¶ 50} Therefore, because there was no Crim.R. 16 discovery violation and because the admission of McCully's statements were harmless even if they were admitted in error, the first assignment of error is overruled.

## C. Other Evidence

{¶ 51} In the second assignment of error, Thomas argues the trial court erroneously admitted the following items into evidence: (1) body camera videos, marked as state's exhibit Nos. 6 and 6A, depicting Kinlow's statements to EMS and

police wherein she identified Thomas as the shooter; (2) Kinlow's testimony that she was afraid to return home from the courthouse because she was being harassed by people; (3) Dwayne McCully's testimony regarding Thomas's admission that he planned to kill Welch; (4) state's exhibit No. 4, footage from a body camera worn by an officer who did not testify at trial; (5) EMS records marked as state's exhibit No. 10, and the victims' medical records marked as state's exhibit No. 23; (6) an event chronology marked as state's exhibit No. 24; and (7) Dr. Galita's autopsy report, marked as state's exhibit No. 300.

{¶ 52} An appellate court reviews a trial court's decision to admit or exclude evidence for an abuse of discretion. *State v. Gale*, 8th Dist. Cuyahoga No. 94872, 2011-Ohio-1236, ¶ 12, citing *State v. Finnerty*, 45 Ohio St.3d 104, 107, 543 N.E.2d 1233 (1989). As previously stated, an abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, at ¶ 35.

{¶ 53} Thomas first argues that the body-camera videos marked as state's exhibits Nos. 6 and 6A should have been excluded because they contained hearsay. Hearsay is a statement, other than one made by the declarant while testifying at the trial, offered in evidence to prove the truth of the matter asserted. Evid.R. 801(C). However, an out-of-court statement is not considered hearsay "if * * * [t]he declarant testifies at trial or hearing and is subject to examination concerning the statement, and the statement is * * * one of identification of a person soon after

perceiving the person, if the circumstances demonstrate the reliability of the prior identification." Evid.R. 801(D)(1)(c).

{¶ 54} The body-camera videos show Kinlow interacting with EMS and police immediately following the shooting. The body-camera videos were authenticated by Officer Dwulat, who responded to the scene, and the trial court limited the statements contained in the videos to Kinlow's statements identifying Thomas as the perpetrator who shot Welch. Kinlow testified at trial and was subject to cross-examination. Therefore, her statements in the body-camera videos were not hearsay.

{¶ 55} Moreover, it was clear that Kinlow was still under the stress of having witnessed her friend being murdered when she made the statements depicted in the body-camera videos. Her statements would, therefore, fall within the excited utterance exception to the hearsay rule even if they were considered hearsay. An "excited utterance" is defined as a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). Therefore, exhibit Nos. 6 and 6A were properly admitted into evidence.

{¶ 56} Thomas argues the trial court erroneously allowed Kinlow to testify that she was afraid to go home after testifying because people were harassing her. The court prohibited this line of questioning, but the jury heard Kinlow mention her fear of certain people, and the court did not provide a curative instruction. Thomas

argues the court should have excluded Kinlow's statement because it was irrelevant and prejudicial.

{¶ 57} To be relevant and therefore admissible, evidence must have a tendency "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. *See also Oakwood v. Makar*, 11 Ohio App.3d 46, 50, 463 N.E.2d 61 (8th Dist.1983).

{¶ 58} Kinlow's statement that she was afraid of people harassing her was irrelevant and should have been excluded. However, Thomas fails to show how this statement prejudiced his defense. Although an error may have been committed, the defendant must demonstrate prejudice to warrant reversal. *Columbus v. McAfee*, 10th Dist. Franklin Nos. 90AP-944 and 90AP-945, 1991 Ohio App. LEXIS 414. A defendant is entitled to a fair trial, not a perfect trial. *Id.* Without a showing of prejudice, the admission of Kinlow's statement that she was afraid of people harassing her is not a reversible error.

{¶ 59} Thomas nevertheless asserts that McCully's testimony that Thomas told him he was planning to kill Welch should have been excluded as a discovery sanction because it was not produced in a timely manner during pretrial discovery. As previously explained in our first discussion of the first assignment of error, the state had no knowledge of this evidence before trial and, therefore, could not have willfully committed a discovery violation.

{¶ 60} In addition, the evidence of Thomas's statement to McCully that he was planning to kill Welch falls within the "statement against interest" exception to the hearsay rule. In *State v. Maldonado*, 9th Dist. Lorain No. No. 01CA007759, 2001 Ohio App. LEXIS 4014, the court held that a defendant's statement that he was planning to kill the victim is admissible as a statement against interest under Evid.R. 801(D)(2). Therefore, the evidence was admissible. But, as previously stated, even if the evidence were admitted in error, the error was harmless in light of other evidence establishing Thomas's guilt.

{¶ 61} Thomas next argues that the trial court erred in admitting state's exhibit No. 4, which was a video taken from a body camera worn by an officer who did not testify at trial. He argues the video was not properly authenticated and that there was no evidence of a proper chain of custody.

{¶ 62} Pursuant to Evid.R. 901(A), a party must properly authenticate documentary evidence as a prerequisite to admissibility. Evid.R. 901(A) provides, in relevant part, that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

> By way of illustration, Evid.R. 901(B) provides that evidence may be properly authenticated by "testimony of witness with knowledge" that "a matter is what it is claimed to be." Further, the authentication requirement of Evid.R. 901(A) is a low threshold that does not require conclusive proof of authenticity, but only sufficient foundation evidence for the trier of fact to conclude that the evidence is what its proponent claims it to be. *State v. Toudle*, 8th Dist. Cuyahoga No. 98609, 2013-Ohio-1548, ¶ 21, citing *Yasinow v. Yasinow*, 8th Dist. Cuyahoga No. 86467, 2006-Ohio-1355, ¶ 81.

*State v. Maust*, 8th Dist. Cuyahoga No. 103182, 2016-Ohio-3171, ¶ 24. This court reviews a trial court's ruling on the adequacy of authentication for an abuse of discretion. *State v. Bowling*, 8th Dist. Cuyahoga No. 93052, 2010-Ohio-3595, ¶ 33, citing *State v. Easter*, 75 Ohio App.3d 22, 26-27, 598 N.E.2d 845 (4th Dist.1991).

{¶ 63} Dwulat testified that he personally observed the evidence depicted in the body-camera video marked as state's exhibit No. 4 because he was standing next to his partner while his partner's camera was capturing the scene depicted therein. Officer Duwalt's first-hand observations of the scene were sufficient to authenticate the images depicted on the video. *See, e.g.*, *Cleveland v. Greear*, 8th Dist. Cuyahoga No. 108190, 2020-Ohio-29 (holding that a victim's testimony that a police body-camera video accurately depicted the events that occurred was sufficient to authenticate the video). Therefore, the court did not err in admitting state's exhibit No. 4.

{¶ 64} Next Thomas argues the trial court erred in allowing the state to introduce evidence of the EMS reports taken of the incident and the victims' medical records. He contends these items should have been excluded because they were not provided to the defense prior to trial. Defense counsel assured the trial court that it did not require a continuance to review the evidence and that they could adequately adjust to the evidence during trial. Although the state should have been more diligent in acquiring this evidence before trial so that it could provide it to the defense in a timely manner, Thomas failed to establish that he was prejudiced by the delay. We, therefore, find that any error in allowing this evidence was harmless.

{¶ 65} Finally, Thomas argues that the event chronology, marked as state's exhibit No. 24, and Dr. Galita's autopsy report, marked as state's exhibit No. 300, should have been excluded because they were duplicative of trial testimony. The event chronology listed the timing of the events of the day and was, therefore, relevant to refuting Thomas's alibi defense. Thomas claimed he opened the door for Detective Cook on Capital Avenue at the time the murder was occurring, but the murder occurred over an hour before Cook arrived on Capital Avenue. Since the chronology accurately described the timing of the events as presented by the evidence, it was not unfairly prejudicial and was properly admitted.

{¶ 66} Dr. Galita's autopsy report showed what parts of Welch's body sustained gunshot wounds. Although the autopsy report was not entirely necessary to the state's case, there is no evidence that its admission unfairly prejudiced the defense. Therefore, it was properly admitted.

{¶ 67} The second assignment of error is overruled.

### D. Indefinite Sentence Under the Reagan Tokes Law

{¶ 68} In the fifth assignment of error, Thomas argues the sentence he received pursuant to the Reagan Tokes Law on his aggravated burglary conviction violates the Ohio and United States Constitutions. Thomas recognizes this court's en banc decision in *State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536 (8th Dist.), where this court found "that the Reagan Tokes Law, as defined under R.C. 2901.011, is not unconstitutional," but raises the argument to preserve the issue in the event the Ohio Supreme Court finds the law unconstitutional. Because Thomas does not

advance any novel argument left unaddressed by the *Delvallie* decision, we find the constitutional challenges presented in this appeal are without merit.

{¶ 69} The fifth assignment of error is overruled.

### E. Ineffective Assistance of Counsel

{¶ 70} In the sixth assignment of error, Thomas contends he received ineffective assistance of counsel because his trial counsel failed to object to the imposition of a sentence under the Reagan Tokes Law. Thomas recognizes that the Ohio Supreme Court may find the Reagan Tokes Law constitutional, in which case this issue would be moot. He nevertheless argues his trial counsel should have objected to the sentence in order to preserve the issue in the event the Supreme Court finds it unconstitutional.

{¶ 71} To establish ineffective assistance of counsel, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonable representation and that he or she was prejudiced by that deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Prejudice is established when the defendant demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

{¶ 72} Regardless of whether counsel's performance was deficient, Thomas cannot establish a claim for ineffective assistance of counsel because he cannot demonstrate that he was, or will be, prejudiced by counsel's failure to object to the sentence imposed pursuant to the Reagan Tokes Law. If the Ohio Supreme Court

were to declare the Reagan Tokes Law unconstitutional, Thomas would have remedy to challenge the unconstitutional sentence under R.C. 2953.21, the postconviction statute. R.C. 2953.21(A)(1)(i) provides:

> (a) A person in any of the following categories may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief:

> (i) Any person who has been convicted of a criminal offense or adjudicated a delinquent child and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States[.]

Thus, R.C. 2953.21(A)(1)(i) allows a criminal defendant to challenge an unconstitutional sentence in a postconviction proceeding. He will, therefore, have a remedy if the Ohio Supreme Court declares the Reagan Tokes Law unconstitutional in the future. And since this court, in *Delvallie*, 8th Dist. Cuyahoga No.109315, 2022-Ohio-470, concluded that the Reagan Tokes Law is constitutional, he cannot demonstrate any prejudice at this particular time. Without a showing of prejudice, Thomas cannot prevail on claim for ineffective assistance of counsel.

{¶ 73} The sixth assignment of error is overruled.

{¶ 74} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

ANITA LASTER MAYS, A.J., and
MICHAEL JOHN RYAN, J., CONCUR

N.B. Judge Eileen T. Gallagher joined the dissent by Judge Lisa B. Forbes in *Delvallie* and would have found that R.C. 2967.271(C) and (D) of the Reagan Tokes Law are unconstitutional.

Judge Anita Laster Mays is constrained to apply *Delvallie's* en banc decision. For a full explanation of her analysis, *see State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 356 (8th Dist.). (Laster Mays, A.J., concurring in part and dissenting in part.)